HARRY ADAMS *v.* STATE OF INDIANA.

[No. 971 S 272. Filed August 10, 1973. Rehearing denied October 1, 1973.]

*Ferdinand Samper, Ferd Samper, Jr.,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Darrel K. Diamond,* Deputy Attorney General, for appellee.

ARTERBURN, C.J.*—The Appellant, Harry Adams, was charged by indictment in two counts with the crimes of premeditated murder and felony murder. After trial by jury, he was found guilty and sentenced to life imprisonment at the Indiana State Prison.

The facts briefly are that on June 13, 1970, a supermarket in Indianapolis was robbed at closing time by three armed men wearing masks and hats. Police officers were summoned to the scene following an alarm, and when the suspects came out of the store, a gun fight resulted. During the course of this action Deputy Summers suffered bullet wounds, but was able to kill one of the robbers. Lieutenant Jimmie Wingate was fatally wounded by a bullet fired from the gun of one of the robbers. Two of the suspects were successful in making their escape. Wingate had fired three bullets, but a subsequent investigation could account for only two of them. Several weeks later, Adams, after having been placed under surveillance, was arrested on a charge of disorderly conduct. He was taken to police headquarters, where, during a preliminary search, police officers observed two bullet wounds on his hips and buttocks. A medical examination by way of X-ray showed metallic fragments to be present in the flesh. A probable cause affidavit was then filed for the purpose of obtaining a search warrant to retrieve the metal fragments from his body. The affidavit contained a statement that a reliable confidential informer had

---

* This case was distributed to the writer of this opinion on June 27, 1973.

told the affiant police officer that Adams was one of the robbers who had been shot and that he had two bullets holes in him. The affidavit did not allege how the informer came to know this information, but it did attest to the informer's reliability. Other facts were alleged with reference to the robbery and the shooting, and the reputation of the Appellant as an armed robber. The affidavit also stated that the bullet fragments could be removed at the hospital through a surgical procedure performed by a licensed medical doctor using a local anesthetic. The court accordingly issued a search warrant authorizing the described medical procedure.

The Appellant raises several questions concerning the legality of his original arrest and detention, and the sufficiency of the probable cause affidavit to authorize the search. We deem it unnecessary to finally decide those issues since we are of the opinion that the only issue necessary to consider on the record before us is the reasonableness of a court-ordered surgical operation on the body of a suspect in order to secure evidence to establish his guilt or innocence.

The Fourth Amendment to the United States Constitution which is made applicable to the states by reason of the Fourteenth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and hereby to brutalize the temper of society."

Article 1, Section 11 of the Constitution of the State of Indiana makes almost identical provision for the maintenance of this right. We think it clear that these provisions apply to an invasion of the magnitude of that occurring in this case, and we are amply supported in that view by the holdings of the United States Supreme Court. In *Rochin* v. *California* (1952), 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183,

the Supreme Court unanimously* held that the forced stomach pumping of a suspect in order to obtain evidence of possession of narcotics was per se *unreasonable* in violation of the due process clause of the Fourteenth Amendment. The opinion by Justice Frankfurter analogized the offensive law enforcement conduct in question to the obtaining of a coerced confession and stated:

> "Coerced confessions offend the community's sense of fair play and decency. So here, to sanction the brutal conduct which naturally enough was condemned by the court whose judgment is before us, would be to afford brutality the cloak of law. Nothing would be more calculated to discredit law and hereby to brutalize the temper of society."

*Id.*, at 173-74, 72 S. Ct. at 210, 96 L. Ed. at 191. The Court was careful to leave open to the states the power to fix the parameters of permissible police investigative conduct. Thus, in our view, we are free, within the limits of the applicable constitutional provisions, to determine the permissible scope of searches and seizures of the kind here before us. *Rochin, supra,* will be our guide.

The United States Supreme Court has recently had occasion to consider the scope of permissible searches and seizures of the person of citizens suspected of crime. *Cupp, Penitentiary Superintendent* v. *Murphy* (1973), 412 U.S. 291, 93 S. Ct. 2000, 36 L. Ed. 2d 900, (Slip Opinion filed May 29, 1973); *U.S.* v. *Mara* (1973), 410 U.S. 19, 93 S. Ct. 774, 35 L. Ed. 2d 99; *U.S.* v. *Dionisio* (1973), 410 US. 1, 93 S. Ct. 764, 35 L. Ed. 2d 67; *Davis* v. *Mississippi* (1969), 394 U.S. 721, 89 S. Ct. 1394, 22 L. Ed. 2d 676; *Schmerber* v. *California* (1966), 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908. It should be noted that in each of the above cited cases, the intrusion upon the body of the suspect was extremely limited. In *Cupp, supra,* over the suspect's protest and without a warrant, police, in

---

\* Justices Black and Douglas relied on the Fifth Amendment in holding the evidence inadmissible.

the course of station house questioning in connection with a murder, took samples from under the suspect's fingernails and discovered evidence later used to convict him. The suspect had come to the station voluntarily since he had not yet been arrested, but he was detained and there was probable cause to believe he had committed the murder. The Court held that in view of the detention upon probable cause, "the very limited intrusion undertaken to preserve highly evanescent evidence was not violative of the Fourth and Fourteenth Amendments." In *U.S.* v. *Mara, supra,* the Court held that the forced production of handwriting exemplars did not violate the Fourth Amendment since the directive forced the disclosure only of a "physical characteristic constantly open to the public." In *U.S.* v. *Dionisio, supra,* a majority of the Court held that compelling a Grand Jury witness to furnish a voice exemplar did not violate the Fourth Amendment, since a subpoena to appear before a Grand Jury was not a "seizure" in the Fourth Amendment sense, and the disclosure was only of a "physical characteristic constantly open to the public" and thus was not subject to Fourth Amendment protection. In *Davis* v. *Mississippi, supra,* the Court held that since the accused's detention was unlawful, his fingerprints were obtained in violation of the Fourth and Fourteenth Amendments. In *Schmerber* v. *California, supra,* the Court, in a 5-4 decision held that under the facts obtaining, the defendant's constitutional rights had not been violated by the compulsory blood test and the admission of the results thereof. There, after the defendant's arrest while he was at a hospital receiving treatment for injuries suffered in an automobile accident, a blood sample was withdrawn by a physician at the direction of a police officer, acting without a search warrant. This was done despite the defendant's refusal to consent to the blood test. The report of the results of the test, indicating intoxication, was introduced into evidence over the objections of the defendant. The majority states:

". . . with respect to searches involving intrusions beyond the body's surface. The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search."

*Schmerber* v. *California* (1966), 384 U.S. 757, 769-70, 86 S. Ct. 1826, 1835, 16 L. Ed. 2d 908, 919. The Court carefully limited its holding by stating:

"We thus concede that the present record shows no violation of petitioner's right under the Fourth and Fourteenth Amendments to be free of unreasonable searches and seizures. It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States *minor intrusions into an individual's body* under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." (emphasis added) *Id.* at 772, 86 S. Ct. at 1836, 16 L. Ed. 2d at 920.

Thus, it is evident that the Supreme Court has been faced with very limited intrusions into or upon the body of persons suspected of crime. In the case at bar, however, we are confronted with an intrusion of the most serious magnitude. Here an actual surgical operation was performed on the Appellant to remove a bullet from inside his body. We do not sanction a surgical operation forced on a defendant for this purpose. We therefore hold that the Fourth Amendment prohibits the type of intrusion into the body of the suspect as occurred in this case.

Prior to *Schmerber, supra,* the Supreme Court of this state held that a blood sample could not be drawn from a defendant charged with involuntary manslaughter, and used to prove intoxication. That case, however, involved the violation of the

physician-patient privilege, and the sample was taken while the patient was unconscious. *Alder* v. *State* (1958), 239 Ind. 68, 154 N. E. 2d 716. Later, in *Green* v. *State* (1971), 257 Ind. 244, 274 N. E. 2d 267, a bullet was handed to a police officer by the attending physician who took the same from defendant's body. In that case, the physician did not testify and the privilege was not violated when a third party was present and observed the extraction of the bullet. It was a matter open to the public generally at the time and the defendant was conscious and did not object to the delivery of the bullet. We held that the evidence observed by the police officer, who had to be present for security reasons, was properly admissible. That case may be easily distinguished from the case at bar, since here the surgeon, Dr. Rice, was asked to identify the bullet he had removed. In *Alldredge* v. *State* (1959), 239 Ind. 256, 156 N. E. 2d 888, we concerned ourselves with a drunkometer test and evidence of defendant's refusal to take same. We stated that the evidence is properly admissible in such a case if the drunkometer test was either voluntarily consented to, or there was no invasion of the defendant's body in performing such a test. Evidence of the refusal to take the test was admissible unless the defendant could show he had objected on the ground of the physical invasion.

We believe that Indiana is in line with the opinions of the United States Supreme Court on this subject. The constitutional provision against self-incrimination is primarily a freedom from *testimonial* compulsion. Witnesses may testify as to marks and scars on the body of the defendant, his fingerprints, and other like matters. but, in our opinion, an operation performed upon a defendant to secure evidence comes within the constitutional prohibition of an unreasonable search. *Rochin* v. *California* (1952), 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183. Judge Treanor covers the matter expertly in *Ross* v. *State* (1932), 204 Ind. 281, 182 N. E. 865.

Thus, we hold that it was reversible error for the trial court to admit the bullet taken from the Appellant's body and to allow the doctor to testify as to the procedure employed or results of any tests of the evidence so obtained.

For the reasons stated, the judgment of the trial court is reversed with directions to grant a new trial.

Hunter, J. concurs; DeBruler, J., concurs with opinion; Givan, J., dissents with opinion in which Prentice, J., concurs; Prentice, J. dissents with opinion in which Givan, J. concurs.


DISSENTING OPINION

GIVAN, J.—I respectfully dissent from the majority opinion in this case.

I think the majority is in error in holding that it is in all instances improper to "enter the body" of a person to obtain evidence which might in some way incriminate that person. This matter was thoroughly explored by the Supreme Court of the United States in the case of *Schmerber* v. *California* (1966), 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826. In that case the defendant had been convicted of driving an automobile while under the influence of intoxicating liquor. He was arrested while receiving treatment for injuries suffered in an automobile accident. At the direction of a police officer a blood sample was withdrawn from the accused's body by a physician. Chemical analysis of the blood sample revealed the presence of alcohol in the blood sufficient to indicate intoxication. The Court discussed and compared that situation with the situation in *Breithaupt* v. *Abram* (1957), 352 U.S. 432, 1 L. Ed. 2d 448, 77 S. Ct. 408. The Court pointed out, however, that the *Breithaupt* case differed from *Schmerber* in that *Breithaupt* was unconscious at the time the blood was withdrawn, and that such act offended "a sense of justice." However, the Court went on to point out that there is a difference between physical examination which is directed to obtain "physical evidence" and that which is conducted to com-

pel "communications" or "testimony." After making such observations, the Court stated:

"In the present case, however, no such problem of application is presented. Not even a shadow of testimonial compulsion upon or enforced communication by the accused was involved either in the extraction or in the chemical analysis. Petitioner's testimonial capacities were in no way implicated; indeed, his participation, except as a donor, was irrelevant to the results of the test, which depend on chemical analysis and on that alone. Since the blood test evidence, although an incriminating product of compulsion, was neither petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner, it was not inadmissible on privilege grounds." *Schmerber, supra,* at p. 765.

In the case at bar, Adams was fully conscious and under medical examination and treatment at the time the discovery was made that his body contained fragments of a bullet which might well establish that he had participated in the robbery in question. Upon making this discovery through medical examination, the Sheriff of Marion County made an affidavit for a search warrant, which affidavit reads as follows:

### "AFFIDAVIT FOR SEARCH WARRANT
### "STATE OF INDIANA, COUNTY OF MARION, SS:

"Lee R. Eads, Marion County Sheriff, swears that he believes and has good cause to believe that Harry J. Adams committed the crime of first degree murder by killing a human being, to-wit: Jimmie V. Wingate, in the perpetration of a robbery on June 13, 1970, at Preston's Super Market, 7021 North Keystone Avenue, Indianapolis, Marion County, Indiana, and that the said Harry J. Adams, a white, male person, approximately 47 years of age, 5'7" tall and 185 lbs., brown eyes, hair dyed black, presently an inmate in my jail under Cause No. M10-70-6721, Marion County Municipal Court, presently has concealed, lodged and imbedded within his person, to-wit: within the soft tissues of the left side of his pelvis and buttocks behind the iliac wing, property constituting evidence of the above described offense and property which shows that the said Harry J. Adams committed the said offense, which property is de-

scribed as follows: scattered metallic fragments which are a residue of gunshot wounds inflicted upon the said Harry J. Adams by the said decedent, from the Marion County Sheriff's 38 calibre service revolver of the said decedent during the commission of the above-described offense, which metallic fragments are more particularly shown by the x-ray of the pelvis of the said Harry J. Adams made on July 5, 1970, at the Marion County General Hospital, which x-ray is attached hereto, made a part hereof, and marked exhibit 'A'.

"That this affiant believes and has good cause to believe that said property above described is so located within the said Harry J. Adams because of the following: That on the 5th day of July, 1970, the said Harry J. Adams was lawfully arrested by Marion County Sheriff Deputy Harlan Rynard on a charge of disorderly conduct and brought to my jail for processing upon said charge. I was told by Marion County Sheriff Floyd Roney, a Detective Sergeant, a person who is credible to my own personal knowledge as a result of daily personal contacts with him in our police work, that he was making a personal inspection of the said Harry J. Adams in the said processing procedure when he discovered two bullet holes of recent origin in the left hip and buttocks of the said Harry J. Adams and the said Harry J. Adams told him, the said Floyd Roney, that the holes had been caused by a fall. I then personally inspected the said Harry J. Adams and saw the two bullet holes in the left hip and buttocks. The said Harry J. Adams was then taken to Marion County General Hospital for examination, x-rays and appropriate treatment. The said Harry J. Adams was x-rayed at said General Hospital on July 5, 1970. S. B. Berkshire, M.D., a credible person as a medical doctor and radiologist, reported to me in a written report that the x-rays of the said Harry J. Adams revealed scattered metallic fragments in the soft tissues of the left side of the pelvis chiefly behind the illiac wing. The said S. B. Berkshire, M.D., testified yesterday in the Marion Criminal Court, Room Two, in a habeas corpus proceedings that these fragments are located from a fraction of an inch to an inch and a half beneath the surface of the skin of the said Harry J. Adams. Timothy Cravens, M.D., a credible person as a medical doctor, reported to me in writing that the said wound in the hip of the said Harry J. Adams was probably due to a gunshot wound. Sgt. Robert Stout, a firearms expert, has personally examined the x-ray attached hereto and has stated to me his opinion that the said metallic frag-

ments, if removed from within the said Harry J. Adams, are of sufficient size that a ballistics examination could reveal what weapon was used to inflict said wound and whether the bullet that made said wound was special police ammunition.

"The search herein requested would be carried out by F. A. Rice, Jr., M.D., a medical doctor licensed to practice medicine in Indiana, a deputy coroner, and a part time doctor for this department, in the presence of this affiant, and the said F. A. Rice, Jr., M.D., has told me that said fragments could be quickly and easily removed from the tissue in a minor procedure under local anesthesia with the aid of a fluoroscope, and that said procedure would involve no pain, discomfort, or risk to the said Harry J. Adams.

"The basis of my belief and good cause to believe that said metallic fragments are a residue from a gun shot wound inflicted in the course of said Robbery by the decedent are as follows. On the 26 day of June, 1970, a confidential informant told me that the man our department was looking for in the Preston's Super Market robbery wherein deputy sheriffs were shot was Harry J. Adams, the man described above, and that the said Harry J. Adams had been shot in the leg in said robbery and had two bullet holes in him. Up to said date when I received this information our department had been conducting a manhunt for a suspect with a bullet wound because our investigation at the scene of this robbery-murder disclosed that the deceased officer, Jimmie V. Wingate, had fired three (3) shots from his 38 calibre service revolver at his assailants as they exited the super market, and only two of his bullets could be accounted for. One of his bullets struck the west brick wall of the market immediately north of the exit door at a height of approximately eight (8) inches above the ground, and the other bullet struck said wall approximately twenty-five (25) inches above the ground. Also, the wounded deputy sheriff, Emery Summers, thought that he might have shot one of the subjects.

"The defendant Harry J. Adams has a record and reputation with this department as an armed robber based upon the facts that he has been arrested four (4) times for robbery and has been convicted of the same twice, having served a 15 year term in Indiana and a 10-25 sentence in Ohio. Also, in the defendant's last arrest for robbery in 1963 in Chicago, he was jointly charged with the crime with William Lemons, his alleged accomplice in this crime who has

been positively identified by Deputy Sheriff Emery Summers as a participant in the instant robbery-murder.

"Our investigation of this case included a check of area hospitals and that check revealed that no one by the name of Harry J. Adams had received any treatment within the preceding month for a gunshot or other wound. The gray hair of Harry J. Adams has been dyed black and the gray hair has now grown partially back. The bullet hole (entrance and exit wounds) is located at an approximate height of thirty (30) inches on the body of Harry J. Adams. Harry J. Adams lied to Deputy Sheriff Floyd Roney when he said he had received the holes in a fall, and the said Floyd Roney told me that he was present when the said Harry J. Adams was being given medical treatment for said wound at Marion County General Hospital and he then and there refused to tell the attending physician, Timothy Cravens, how he had received his injury.

"All of the above facts corroborate the information supplied me by my informant that the defendant, Harry J. Adams was involved in the said robbery-murder and had been shot therein, and all of the above establishes probable cause to believe that the requested search will yield property constituting evidence of the above described offense and property which shows that the said Harry J. Adams committed the said offense.

"Further, on July 23, 1970, this affiant obtained a Search Warrant for a search of the said Harry J. Adams, which Search Warrant is attached hereto, made a part hereof and marked Exhibit 'A'. That the undersigned, by his Deputy Dushan Stiko, a Detective Sergeant, and with the Marion County Sheriff's Department, who I personally know is credible due to my association with him in police work for many years, served this warrant on the said Harry J. Adams on July 26, 1970, and Sgt. Stiko told me that when so served the said Harry J. Adams told him that he would resist the search by force and physical violence if only a local anesthetic was used on him.

"S/Lee R. Eads

"Subscribed and sworn to before me, this 4th day of August, 1970.

"S/William Sharp
JUDGE of the Municipal Court of Marion County."

It is clear from the affidavit submitted to the Judge who issued the warrant that probable cause existed to believe that the bullet fragments were, in fact, in the body of the appellant; that they were located a short distance under the skin in an area readily accessible by minor surgery and the extraction of those particles would pose no health hazard to the appellant. Under these circumstances, it seems abundantly clear that the search of appellant's body for the fragments was reasonable.

The Fourth Amendment to the Constitution of the United States reads as follows:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Essentially the same language is contained in Article 1, § 11 of the Constitution of Indiana.

I agree with the Supreme Court of the United States in the *Schmerber* case, *supra,* and their holding that it is not *per se* a violation of the Constitution to invade a person's body to obtain evidentiary matter. The real test in all cases of search, certainly in the case of invasion of the human body, is the test of reasonableness: i.e., a protection of the person involved against an unreasonable search of his body. Certainly one can conceive of a situation where a bullet might be so imbedded in the body that removal would constitute a great hazard to the life or physical well being of the person involved. In such a case a warrant should be refused on the ground that the search was unreasonable. Where, however, as in the case at bar, it is made abundantly clear to the Judge issuing the warrant that no such hazard exists and that the article is readily obtainable by a minor operation, the search then becomes reasonable.

I would, therefore, hold that the search warrant issued in this case was properly issued and that the evidence obtained by such search was admissible in the trial of the appellant.

Prentice, J., concurs.

## CONCURRING OPINION

DEBRULER, J.—Appellant has presented three grounds to support his position that the bullet fragments removed from his body by the police doctor should have been suppressed and excluded from the evidence. The first argument is that the probing of his body and removal of the bullet fragment was "unreasonable" within the meaning of that term in the Fourth Amendment. This argument forms the basis for the majority opinion. I agree with the majority in the resolution it makes of that issue. The second argument made by appellant is that there was no "probable cause" shown in the affidavit for search warrant. The third argument is that the knowledge which the police obtained as the result of viewing him stripped in the police station, followed by the X-ray procedure and the ultimate operation was all obtained illegally in that it was the product of his warrantless, illegal, and pretext arrest for disorderly conduct.

In support of his second contention, appellant states that the affidavit for search warrant, set out in full in Justice Givan's dissenting opinion, failed to meet the requirements set for such affidavits by IC 1971, 35-1-6-2, being Burns § 9-602. The critical part of the affidavit is the following:

"The basis of my belief and good cause to believe that said metallic fragments are a residue from a gun shot wound inflicted in the course of said Robbery by the decedent are as follows: On the 26 day of June, 1970, a confidential informant told me that the man our department was looking for in the Preston's Super Market robbery wherein deputy sheriffs were shot was Harry J. Adams, the man described above, and that the said Harry J. Adams had been shot in the leg in said robbery and had two bullet holes in him."

I agree that this is a critical part, since it alone connects the appellant with the robbery. The Judge's conclusion that probable cause existed for issuance of the search warrant was necessarily, therefore, derived from statements made to the affiant by an unnamed confidential informant. The statute governing affidavits for search warrants reads as follows:

> "When based on credible hearsay, the affidavit shall contain reliable information supplied to the affiant by a credible person, named or unnamed, and it shall contain the following: (a) Affirmative allegations that the credible person spoke with personal knowledge of the matters contained therein, (b) The facts within the personal knowledge of the credible person, (c) The facts within the affiant's knowledge as to the credibility of the credible person. . . ."

It is obvious to me that this affidavit does not contain a statement of the facts known personally by the informant, nor does it contain the facts known by the maker of the affidavit which supported his conclusion that the unnamed confidential informant was credible. I agree with appellant that the affidavit was fatally deficient in this regard and the evidence taken pursuant to the warrant issued upon the basis of it should have been suppressed. *Ferry* v. *State* (1970), 255 Ind. 27, 262 N. E. 2d 523. The state in its brief admits that the affidavit does not contain statements required by our statute, but in response relies upon *Draper* v. *U.S.* (1959), 358 U.S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327, and argues that the affidavit itself contains substantiation of the statements of this confidential informant. The reliance of the State upon this case is misplaced for two reasons. First, it is our statute which governs in this case, and not a United States Supreme Court case which appears to establish a lesser standard for determining probable cause. Secondly, the *Draper* case is distinguishable from the case before us in that in it the credibility of the informant was clearly shown. There the informant had been a "special employee" of the Bureau of Narcotics for six months and had been paid several times for information regarding violations and the information given by him had al-

ways been accurate and reliable. In the case before us, nothing is revealed at all about the credibility of the informer. The trial court erred in not suppressing the evidence on this second ground.

I do not take the time to consider the merits of the third argument of appellant, having been convinced that there are at least two sufficient grounds to hold that the evidence here was erroneously received. However, suffice it to say, the contention appears to be of substantial merit.

### DISSENTING OPINION

PRENTICE, J.—The proposed majority opinion treats only one issue presented by this appeal. I dissent from the view expressed in such opinion upon that issue, i.e. "the reasonableness of a court-ordered surgical operation on the body of a suspect in order to secure evidence to establish his guilt or innocence."

I do not see in *Rochin* v. *California* (1952), 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183, relied upon by the majority, a proscription of minor surgical procedures under the circumstances of the case at bar. For comparison, the facts stated in the *Rochin* decision are set out as follows:

"Having 'some information that [the petitioner here] was selling narcotics,' three deputy sheriffs of the County of Los Angeles, on the morning of July 1, 1949, made for the two-story dwelling house in which Rochin lived with his mother, common-law wife, brothers and sisters. Finding the outside door open, the entered and then forced open the door to Rochin's room on the second floor. Inside they found petitioner sitting partly dressed on the side of the bed, upon which his wife was lying. On a 'night stand' beside the bed the deputies spied two capsules. When asked 'Whose stuff is this?' Rochin seized the capsules and put them in his mouth. A struggle ensued in the course of which the three officers 'jumped upon him' and attempted to extract the capsules. The force they applied proved unavailing against Rochin's resistance. He was handcuffed and taken to a hospital. At the direction of one of the officers a doctor forced an emetic solution through a tube into

Rochin's stomach against his will. This 'stomach pumping' produced vomiting. In the vomited matter were found two capsules which proved to contain morphine." 342 U.S. at 166.

In *Rochin*, the police had no authority to take such action. They entered Rochin's dwelling by force and interrogated him. Such conduct was itself improper. Here, the questioned conduct was done under the authority of a search warrant. The events in this case do not involve the elements of force and violence. The case is better compared with *Schmerber* v. *California* (1966), 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908, where the Supreme Court of the United States upheld the trial court in admitting the results of tests of blood extracted from the body of the defendant over his protest. The reasonableness of such intrusions, it appears to me, must depend upon the circumstances of each case. Here, there was a judicial determination of probable cause to believe, not only that the critical evidence was embedded in the fatty tissue of the defendant's posterior, but also that he had been involved in the perpetration of the crime. The surgical procedure required to remove the evidence posed no threat of serious bodily injury, mental anguish or even physical discomfort to the defendant. Obviously, we would not sanction open heart surgery or brain surgery upon suspicion that evidence of questionable value relative to a charged misdemeanor might be thereby obtained. I do not agree, however, that the simple surgical procedure performed upon the defendant under local anaesthetic was an "intrusion of the most serious magnitude." Under the circumstances in this case, I think such removal was warranted and did not offend against the state or federal constitutional proscriptions.

I do question the propriety of the surgical activity involved in this case without a prior hearing affording the defendant an opportunity to protest and bringing forth medical testimony. Such question, however, has not been presented here.

I would affirm.

Givan, J. concurs.

NOTE.—Reported in 299 N. E. 2d 834.