STATE of Missouri, Respondent,

v.

Tommie Warren OVERSTREET, Appellant.

No. 59833.

Supreme Court of Missouri, en banc.

June 14, 1977.

James M. Smith, Asst. Public Defender, St. Louis, for appellant.

John Ashcroft, Atty. Gen., Jeff Schaeper-koetter, Asst. Atty. Gen., Jefferson City, for respondent.

FINCH, Judge.

Defendant was convicted of first degree murder and first degree robbery under §§ 559.010 and 560.120, RSMo 1969, and sentenced to concurrent terms of life and five year imprisonment. He appealed to the Missouri Court of Appeals, St. Louis District, which affirmed, but a dissenting opinion was filed. The court then sustained defendant's application to transfer the case to this court. We now review the case as though here on direct appeal. We reverse and remand.

On January 3, 1974, two men, one of whom the State's witnesses identified as defendant, entered the office of the Straight Way Iron and Metal Co. in St. Louis. The two men, apparently unarmed, approached Louis Adelstein, president of the company, and demanded money. A struggle ensued in which Adelstein pulled a gun and started firing, wounding the man identified as defendant. During the fight, Adelstein dropped his gun. Defendant's companion grabbed it and shot and fatally wounded Adelstein. The two men then fled, taking the victim's gun with them.

During the morning of January 3, 1974, defendant went to Homer G. Phillips Hospital for treatment of a bullet wound in his left buttock. The police were notified that the victim of a shooting at Clarendon and Kensington was at the hospital and Officer Daniel Crane was dispatched to investigate. On arrival, he asked defendant how he received the gunshot wound. Defendant responded that he left his house at 5153 Kensington at 11:30 a. m. and walked west on Kensington to its intersection with Clarendon. There he became involved in a dice game with strangers. While squatting, he heard a noise like a gunshot and felt a sting in his left hip. He turned and saw a car go south on Clarendon. Defendant said that he then returned to 5153 Kensington, changed his trousers and came to the hospital.

Treating defendant as the victim of a shooting, not one suspected of committing a crime, Officer Crane went to the intersection of Kensington and Clarendon to investigate the shooting. The ground was covered with snow and the officer discovered that at the point where defendant said the dice game occurred, the snow was undisturbed. He then went to 5153 Kensington and learned that an aunt of defendant lived there but defendant did not and that the aunt had not seen defendant that morning.

Officer Crane called the Homicide Division and reported what he had learned. He then returned to the hospital. He again asked defendant how he received the gunshot wound but defendant said nothing.

In response to Officer Crane's call, two detectives from homicide came to the hospital and, without giving Miranda warnings, asked defendant about the gunshot wound. He repeated what he had told Officer Crane. The detectives then gave defendant the prescribed Miranda warning. Thereafter, with defendant's consent, they continued to question him. In response to questions, he then stated that he was walking along the street in the vicinity of the Straight Way Iron and Metal Co. and was hit by a stray bullet. After further conversation, he

stated he had not told them the truth and wanted to speak to Lt. Adkins.

When Lt. Adkins appeared, defendant again was advised of his Miranda rights. Defendant then told Lt. Adkins that he had been shot by persons who accused him of selling bad marijuana.

After defendant had been indicted and arraigned, the State filed motions on March 13 and March 20, 1974, whereby they sought to have defendant examined by a doctor to ascertain whether a metal bullet was lodged in soft tissue of defendant's buttocks and whether, under accepted medical procedure, the bullet could be removed by minor surgery without endangering defendant's health, safety or life. If it could, the State requested that the operation be ordered and that the bullet, when removed, be turned over to the police department.

On March 21, 1974, the court entered an order that defendant be delivered to the hospital to "be examined to determine if a metal pellet located in the buttocks of the defendant could be removed through the use of proper medical procedures without endangering the health, safety, or life of the defendant, and also if said metal pellet were to remain in the buttocks of the defendant whether the metal pellets so remaining in the buttocks of the defendant would constitute a danger to the health, safety or life of the defendant".

Thereafter, the State filed with the court two letters received by the prosecutor's office from Dr. Bazzano, the acting chief of staff of the hospital. In one letter he advised that from x-rays of defendant "it appears that the metallic density is overlying the left femoral head and appears to be fairly superficial. On this basis, the object could be removed with a very simple surgical procedure without threatening life or unexpected medical complications to the above subject". In the other letter the doctor stated that there was no compelling medical reason for removing the bullet at that time.

On May 7, 1974, without any evidentiary hearing, the court entered an order that defendant be delivered to the hospital the next day for the purpose of removal of a metal pellet from the soft tissue of defendant's left buttock. That order contained these provisions:

"It is further ordered that the defendant be delivered to Dr. J. Zanzzo of the Medical Staff of City Hospital Number One, at the above date and time, and that the defendant be examined to determine whether a metal pellet located in the left buttock of the defendant can be removed through the use of simple medical procedures without endangering the health, safety, or life of the defendant.

"If said metal pellet is found to be recoverable from the person of the defendant, without endangering the health, safety, or life of the defendant, Dr. Zanzzo is then directed to remove the said metal pellet from the left buttock of the defendant. The metal pellet is then to be given to Detective William Jones of the St. Louis Metropolitan Police Department, * * *."

Pursuant to the foregoing order, the bullet was removed after administration of a local anesthetic in the area where two incisions were made. The bullet was deeper than anticipated and incisions three and a half to four inches in depth were required. A clamp was utilized to withdraw the bullet, after which the incisions were sutured. An antibiotic and a tetanus toxoid were administered. Defendant was discharged from the hospital the following day. No complications developed.

At trial, defendant objected to introduction of the bullet taken from his body on the basis that granting the State's motion to order the operation to remove the bullet from defendant's body and subsequently performing the operation violated his constitutional rights against unreasonable search and seizure as guaranteed by the fourth amendment to the constitution of the United States. Whether this complaint is valid and whether admission of the bullet in evidence entitles defendant to a new trial is the first issue we address.

The principal decision by the U. S. Supreme Court on this subject is *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In that case defendant was arrested in a hospital while receiving treatment for injuries received in an automobile accident. Defendant apparently had been drinking. The police, without a search warrant or a court order, directed the physician at the hospital to withdraw a sample of blood from defendant's body. It was analyzed to determine alcoholic content and the result thereof was admitted in evidence over defendant's objection that this violated his constitutional rights under the fourth, fifth and fourteenth amendments to the United States Constitution.

The Supreme Court rejected defendant's claim under the due process clause and held that there had been no violation of defendant's fifth amendment privilege against self-incrimination. It then considered defendant's contention that the intrusion into his body to secure the blood sample violated his fourth amendment right against unreasonable search and seizure. In overruling this contention, the court said at 768, 86 S.Ct. at 1834:

"* * * [T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner. * * * *"

The court then pointed out that in this instance the blood sample was taken in the hospital according to accepted medical practice and was performed in a reasonable manner.

The court summarized its holding in these words,

"We thus conclude that the present record shows no violation of petitioner's right under the Fourth and Fourteenth Amendments to be free of unreasonable searches and seizures. It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." *Id.* at 772,[1] 86 S.Ct. at 1836.

Since the decision in *Schmerber*, there have been several cases in which courts have considered whether and when intrusions into a defendant's body to procure evidence of a crime are prohibited by the fourth amendment to the U. S. Constitution.

In *Adams v. State*, 260 Ind. 663, 299 N.E.2d 834 (1973), cert. denied sub nom. *Indiana v. Adams*, 415 U.S. 935, 94 S.Ct. 1452, 39 L.Ed.2d 494 (1974), the court reversed a conviction and remanded the case for a new trial on the basis that a court authorized removal of bullet fragments by surgical procedure under a local anesthetic violated defendant's fourth amendment rights. It held that admission in evidence of the bullet fragments was reversible error. In so doing, the court adopted a rule that any such surgical procedure is *per se* a violation of the fourth amendment. So far as we have been able to ascertain, this is the only case which has adopted a *per se* rule.

Defendant urges that we follow *Adams* and adopt a *per se* rule. We decline to do so. In our view, the fourth amendment does not so require. *Schmerber* confirms

1. There are two earlier cases, cited by both parties, which considered intrusions into defendant's body to secure evidence for use in the trial of defendant. *Rochin v. California*, ·342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), involved the forcible removal of two capsules of morphine from defendant's stomach. The court excluded that evidence on the basis that what occurred was so brutal and offensive and so "close to the rack and the screw" as to be constitutionally impermissible. Obviously, the court did not find such shocking conduct in *Schmerber*. The other case, *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), also involved a blood test taken while defendant was unconscious after a highway collision. Defendant was convicted of manslaughter in the New Mexico state courts and the result of a blood test was received in evidence. The Supreme Court affirmed.

that view when it says, as previously noted, that it does not prohibit all intrusions as such but only those "which are not justified in the circumstances, or which are made in an improper manner." 384 U.S. at 768.

In *Bowden v. State*, 256 Ark. 820, 510 S.W.2d 879 (1974), the court held that a search warrant authorizing removal of a bullet from defendant's spinal canal would result in a major intrusion into defendant's body involving trauma, pain, a risk of serious complications and the possible loss of life. Consequently, said the court, surgical removal of such bullet would be contrary to the standard of reasonableness established by *Schmerber* and would violate defendant's fourth amendment rights.

*Creamer v. State*, 229 Ga. 511, 192 S.E.2d 350 (1972), cert. dismissed, 410 U.S. 975, 93 S.Ct. 1454, 35 L.Ed.2d 709 (1973), involved the propriety of a trial court order to have defendant in a murder case transported to the hospital for removal of a bullet from the fat, subcutaneous area of the right side of the chest. At a hearing which preceded the court's order, a physician testified as to the location of the bullet and that the removal would be under a local anesthetic and would involve no risk to the defendant.

The operation was stayed pending review of the trial court's order by the Supreme Court of Georgia. That court held that under *Schmerber* the operation would not violate any of defendant's rights guaranteed by the U. S. Constitution or any rights under the Georgia constitution and statutes. A dissenting opinion agreed that the procedure would not violate defendant's rights under the federal constitution but insisted it would violate provisions of the Georgia constitution.[2]

In *United States v. Crowder*, 543 F.2d 312 (D.C.Cir. 1976), cert. denied, 429 U.S. 1062, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977), the court ruled that defendant's fourth amendment rights were not violated when the district court ordered surgical removal of a bullet from defendant's arm and subsequently received the bullet in evidence in defendant's trial on a charge of murdering a dentist during an attempted robbery. We devote more attention to this case because of our conclusion that it clearly and correctly enunciates the standards to be applied in determining whether surgical removal of a bullet should be authorized and because it involved the use of procedures we deem appropriate for resolving such a question.

Acting on information from an associate that Crowder had been involved in the attempted robbery and subsequent shooting, and himself had been shot during the occurrence, the officers arrested Crowder. After noting that his right wrist and left thigh were bandaged, the officers took Crowder to the hospital where x-rays disclosed what appeared to be .32 caliber bullet lodged in his right forearm and another in his left thigh. A .32 caliber revolver had been found at the scene of the shooting.

The United States Attorney presented to the Chief Judge of the district court an application for an order authorizing surgical removal of the bullet from Crowder's arm. It was accompanied by an affidavit from a detective reciting the pertinent facts to show materiality of and need for the evidence sought and by an affidavit of a doctor which confirmed that x-rays disclosed the presence of metallic foreign bodies in Crowder's left thigh and right forearm. The latter affidavit stated that the slug in the right forearm was lying superficially under the skin and that in the doctor's medical opinion, based on reasonable medical certainty, the removal of the slug would be considered minor surgery and would not involve any harm or risk of injury to Crowder. It stated that if the surgery should be authorized, it would be performed in an operating room at the hospital under a local anesthetic. The affidavit stated that it would be inadvisable to remove by surgery the bullet in the thigh.

2. In this connection, we note that in *Allison v. State*, 129 Ga.App. 364, 199 S.E.2d 587 (1973), the court of appeals upheld a procedure whereby a doctor had removed by surgery a bullet lodged under defendant's skin. The court stated that it was compelled to follow *Creamer* but said that absent that decision, it would have held that the procedure was violative of the Georgia constitution. It also expressed doubt as to the propriety of *Schmerber*.

The Chief Judge held an adversary hearing on the application with defendant and his attorney present. The doctor testified at that hearing and was cross-examined by defendant's counsel. Thereafter, the Chief Judge found probable cause to believe that Crowder murdered the dentist and that " 'evidence or instrumentality of that offense' " was located in Crowder's forearm and thigh. He found that it was medically inadvisable to remove the slug from the thigh but that the surgical removal of the slug lying superficially beneath the skin of the right forearm would not involve any harm or risk of life or injury to Crowder's arm or hand or the use thereof.

On the basis of his findings, the Chief Judge, relying on *Schmerber,* ordered removal of the slug from the forearm. The order directed that the removal be performed in the hospital according to accepted medical procedures, with due regard for the health and life of Crowder. It went on to state that "if at any time during the course of the removal procedures danger to the life of James L. Crowder develops, such removal procedures shall cease and such other steps as may be necessary shall be taken to protect the health and life of James L. Crowder; * * * "

Before the operation ordered by the Chief Judge was performed, the defendant had the opportunity, of which he availed himself, to seek appellate review of the order directing the surgery. As noted in *Crowder,* defendant sought but was denied prohibition in the Court of Appeals for the District of Columbia. 543 F.2d at 314.

After defendant was tried and convicted, the propriety of what was done with reference to removal of the bullet from Crowder's arm was reviewed extensively on appeal by the court of appeals. 543 F.2d at 313–317. Referring to the statement in *Schmerber* that "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner", the court commented: "When this standard is applied to the facts we have

outlined we think the conclusion is irresistible that the removal of the bullet from Crowder's arm was reasonable and proper." *Id.* at 316.

Summarizing its holding, the court said:

"We do not find in these procedures, as the Supreme Court did in *Rochin v. California,* 342 U.S. 165, 172, 174, 72 S.Ct. 205, 209, 210, 96 L.Ed. 183 (1952), and the defendant does here, any conduct 'so brutal and so offensive to human dignity' that it 'shocks the conscience.' Reasonableness of course is a matter of degree and we do not say that a court may authorize any challenged operation, no matter how major. The limits of reasonableness are well illustrated by the distinction drawn in Chief Judge Curran's order between the bullet in the arm and the one in the thigh; since removal of the bullet in the thigh might cause permanent injury to Crowder it was forbidden. In any event we are not here called upon to give general approval of surgical operations in search of evidence. We are concerned only with the procedures followed in this case. We think those procedures were reasonable and justified in the circumstances. We repeat and summarize the factors that lead us to this conclusion: (1) the evidence sought was relevant, could have been obtained in no other way, and there was probable cause to believe that the operation would produce it; (2) the operation was minor, was performed by a skilled surgeon, and every possible precaution was taken to guard against any surgical complications, so that the risk of permanent injury was minimal; (3) before the operation was performed the District Court held an adversary hearing at which the defendant appeared with counsel; (4) thereafter and before the operation was performed the defendant was afforded an opportunity for appellate review by this court." *Id.*

■ Did what occurred in this case meet the requirements as laid down in *Schmerber* as amplified and applied in *Crowder?* We conclude not. In the first place, there was no judicial adversary hearing in which de-

fendant had the opportunity to cross-examine and offer witnesses. An intrusion by surgery such as was involved in *Crowder* and was utilized in this case should not be authorized without an adversary hearing on the government's request for such surgery. In addition, an opportunity for appellate review of proposed surgery to remove a bullet or other object from a defendant's body should be available as it was in *Crowder* and *Creamer*. An application for a writ of prohibition would be an appropriate procedure for this purpose. While interlocutory appellate review of ordinary search and seizure questions is not and should not be available, such is not the case when the issue is whether surgery shall be performed on defendant. Instances wherein such authorization is sought will occur very infrequently. When they do, the appellate review should be handled forthwith in order not to delay trial of the criminal charge. Only by providing such review *before* surgery can appellate review be meaningful and a defendant be given the means of testing whether proposed surgery comes within the standards of *Schmerber* and *Crowder*.

The second reason why what occurred here did not conform to the requirements of *Schmerber* as applied in *Crowder* is that we do not have in this case a finding by the court, based on medical evidence presented, that the surgery will be a minor intrusion which can be performed without risk of harm or injury to the defendant. Instead, the court order, entered following presentation of the two letters from the acting chief of staff of the hospital, delegated to the surgeon designated to perform the operation the responsibility of determining whether the bullet was recoverable without endangering the health, safety or life of defendant. Only if the surgeon answered that question in the affirmative was he authorized by the order to proceed with the surgery.

Such determination may not be delegated by the judge to the doctor. It must be a judicial finding made by the judge as it was in *Crowder*. In making such finding, the judge obviously will consider the testimony of the doctor or doctors, including their medical opinion as to the character of the surgery and the risk involved, but the final resolution of the issue as to whether the proposed surgery constitutes a major or minor intrusion and whether it can be performed without risk of harm or injury to defendant must be by the judge. Such a clear and unequivocal determination is lacking in this case. Therefore, for the foregoing reasons, we must hold that admission in evidence of the bullet removed from defendant's buttocks was reversible error. That necessitates reversal and remand for a new trial.

There are certain other questions raised by defendant which we should and do decide because they are of such a nature that they will arise on retrial of this case.

■ The first such issue involves the admissibility of statements made by defendant to Officer Crane, the detectives from homicide and Lt. Adkins. The first of these was the statement to Officer Crane when he came to the hospital to interview defendant as the victim of a shooting at Claredon and Kensington. No Miranda warning preceded that statement but none was necessary. Defendant was not in custody and was not suspected of having committed an offense. He was considered to be victim, not a perpetrator. Under such circumstances, no Miranda warning was required because it protects only against the use of statements stemming from custodial interrogation of a defendant without the use of procedural safeguards. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Oregon v. Mathiason,* 492 U.S. 429, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). The statement was properly admitted.

■ The other statements admitted in evidence were the ones in which defendant told the detectives that he was hit by a stray bullet while walking in the vicinity of the Straight Way Iron and Metal Co. and then told Lt. Adkins that he was shot by persons who accused him of selling bad marijuana. Both of these statements were preceded by Miranda warnings but defend-

ant claims that even so, they were inadmissible because they were tainted fruits of his earlier statement to the detectives which the court excluded. There is no merit to this contention. In the statement which the court excluded, made before a Miranda warning was given, defendant simply repeated to the detectives the same statement which he had made to Officer Crane in their first conversation. The essence of that statement was already known to the detectives and it was of no benefit to them. Hence, it did not "let the cat out of the bag", the common malady of the "tainted fruit" cases. The subsequent statements to the detectives and Lt. Adkins were not "tainted fruit" and were properly admitted.

█ The next issue likely to arise on retrial is admissibility of identification testimony of J. D. Sims, an employee of the Straight Way Iron amd Metal Co. Defendant contends that such testimony should have been suppressed for the reason that his confrontation with defendant at the hospital where Sims identified him as a participant was unduly suggestive.

Sims testified that he was working in the same room in which Louis Adelstein was working. He saw the two young men come into the room from the outside. He was about twelve feet from them. They walked up to Adelstein and engaged him in conversation. The witness turned to his work. Sims next heard each of them say "give me your money". He saw the men struggling with Adelstein who drew a gun and shot defendant. He saw Mr. Adelstein drop the gun and the second man pick up the gun and shoot Mr. Adelstein who had subdued defendant and was astride him. He saw the defendant and his companion run. Defendant was limping. When the shooting started, Mr. Sims backed into a little room known as the battery room where he watched what was going on by looking around the corner of the doorway. He was protecting himself but watching the occurrence.

On the morning of January 4, 1974, Sims was taken to the hospital by Officers Jones and McCoy. He testified that the officers told him that they wanted him to view two men for the purpose of determining whether one of them was the subject he had seen at the Adelstein shooting. He further testified that as they drove to the hospital, he was shown about fifteen photographs. He picked out one of defendant as one of the men he had observed.[3] He asked the name and was told it was Overstreet. He also was told, according to Sims, that Overstreet was in the hospital with a gunshot wound.

When he arrived, Sims was taken into a room where there were two (three according to one of the officers) men in bed. All were covered with sheets, only their faces being visible. Sims could not see whether any had gunshot wounds and was not informed in that regard. Sims was asked whether he saw a man who had been a participant in the Adelstein incident. He replied in the affirmative and pointed out defendant.

Defendant argues that what occurred was unduly suggestive and tainted Sims' in-court identification of defendant. We disagree. Even accepting the premise that photographs were shown to Sims before he visited the hospital, that he identified one as defendant and was told his name and that he was told that defendant was in the hospital with a gunshot wound, that did not make the hospital identification unduly suggestive. There was no evidence that one of the men in the room was pointed out as being Tommie Overstreet. Sims could not tell whether either of the men had a gunshot wound. He was asked only if he saw in the room one of the participants in the affray at the Straight Way Iron and Metal Co.

When Sims identified defendant from a photograph, the officers could have stopped and relied thereon. However, they went ahead and took Sims to the hospital and had him look at the men in the beds and state, without any prompting or assistance, whether one of them had been a participant in the encounter with Adelstein. That effort to be certain that they were holding

---

3. The officers testified that photographs were not shown to Sims on the way to the hospital.

the right man was proper, not to be condemned. *State v. Parker,* 458 S.W.2d 241 (Mo.1970).

Even if such hospital identification had been tainted, which we hold it was not, the in-court identification of defendant still would have been admissible for the reason that there was an independent basis for such identification. Sims had been at the scene of the crime. He saw the two men enter the room and walk up to Adelstein. He was about 12 feet from them. He heard the demand for money and saw the events which followed. When the shooting started, he backed into a small adjoining room from which spot he continued to watch. This gave him an independent basis for his positive in-court identification of defendant. It was not error to admit Sims' identification testimony.

█ Finally, we consider defendant's contention that the trial court erred in overruling his motion to dismiss Count II of the indictment, a charge of robbery, on the theory that the robbery was merged in Count I, a charge of felony murder, since the robbery was an essential part of the felony murder charge. The submission of both counts, says defendant, subjected him to multiple convictions and punishment for a single offense.

This argument has been advanced many times. Perhaps the best answer to this contention is found in *State v. Chambers,* 524 S.W.2d 826 (Mo. banc 1975). In that case defendant was charged and convicted under the felony-murder rule of felonious stealing and four murders in the second degree committed during the perpetration of the theft. Defendant argued that the underlying felony of stealing, being an essential part of felony-murder, merged into the murder counts; that to be tried and convicted for both felonies (the stealing and the second degree murders) was in violation of the doctrine of double jeopardy. The court rejected that contention, saying at 831:

> "In summary, where a homicide is prosecuted under the felony-murder rule, the other felony does not become, *a fortiori,*

merged in or an element of the offense of murder, and the defendant may be prosecuted for both the homicide and the underlying felony without being twice placed in jeopardy if the conviction of each offense requires proof of essential elements not required for conviction of the other. \* \* \*"

We rule this point against defendant.

Judgment reversed and remanded.

MORGAN, HENLEY and RENDLEN, JJ., concur.

BARDGETT, J., concurs in result in separate opinion filed.

SEILER, C. J., concurs in separate opinion of BARDGETT, J. concurring in result.

DONNELLY, J., concurs in result in separate opinion filed.

BARDGETT, Judge, concurring in result.

I concur in the principal opinion except as to the issue of removal of the bullet from the defendant, as to which I concur only in result.

The cases bearing upon the issue appear in the principal opinion and the concurring in result opinion of Donnelly, J.

I do not believe *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) approves any surgery. *Schmerber* involved a simple blood test and it is obvious from the court's opinion that it recognized such tests to be so routine and commonplace that common experiences showed there to be virtually no risk, trauma, or pain.

I suggest that no court could realistically say that an incision three-inches deep in one's buttock is routine and commonplace or that common experience teaches that such wounds involve virtually no risk, trauma, or pain.

The cases subsequent to *Schmerber* which have approved surgery on a defendant to remove a bullet seem to utilize as their criterion for judging the constitutionality of the operation the predictable danger to the life or health of the defendant. If the

danger appears to be minimal, then the surgery (search) is held to be reasonable. I do not believe the United States Supreme Court approved the blood test in *Schmerber* simply on the ground that the test presented virtually no danger to the life or health of the defendant. Danger was a factor considered by the court but the court certainly did not measure the breadth of the Fourth Amendment on that factor alone. It seems to be quite clear that the court viewed a blood test to be so routine and so widely accepted in our society that its performance simply could not be seen as offensive to anyone's integrity or sensibility and, therefore, it was not unreasonable. In my opinion the same cannot be said of surgery. There is nothing in *Schmerber* from which one could say it gives implied approval to involuntary surgery. To the contrary, the court went out of its way to explicitly restrict the application of *Schmerber* when it said at 772, 86 S.Ct. at 1836:

"  .  .  .  It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions."

It is the integrity of a person's body that is the cherished value protected by the Fourth Amendment. I believe this value is constitutionally protected even though the surgery will, predictably at least, not threaten the life or health of the person.

Surgery is a "more substantial intrusion" into a person's body than a hypodermic needle which is used to withdraw a small amount of blood. When the United States Supreme Court says, as it did in *Schmerber*, that its holding does not authorize a more substantial intrusion that that which is involved in a blood test, I find it impossible to construe that restrictive language as authorizing surgery. I would follow *Adams v. State*, 260 Ind. 663, 299 N.E.2d 834 (1973),

cert. denied sub nom. *Indiana v. Adams*, 415 U.S. 935, 94 S.Ct. 1452, 39 L.Ed.2d 494 (1974), and hold that involuntary surgery is, *per se*, a violation of the Fourth Amendment.

DONNELLY, Judge, concurring in result.

I concur in the principal opinion except as to the issue of removal of the bullet from defendant. Because of the treatment given that issue by the principal opinion, I must concur only in the result.

The removal of the bullet raises Fourth and Fourteenth Amendment issues, which in this instance should have been resolved in favor of the defendant. I believe the surgery to which the defendant was ordered to submit violated the proscriptions of those amendments.

To resolve the issue presented, we look for guidance to the cases of *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) and *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

In *Rochin*, three deputy sheriffs forcibly entered Rochin's home without a warrant and made their way to the bedroom where Rochin swallowed two capsules. Following an unsuccessful attempt by the deputies to remove the capsules from Rochin's mouth by force, he was rushed to a hospital where, at the direction of the deputies, a doctor forced an emetic solution through a tube into Rochin's stomach. The procedure induced vomiting which produced the capsules which were found to contain morphine. In the opinion delivered by Justice Frankfurter the Court declared (342 U.S. at 172 and 173, 72 S.Ct. at 209–210):

"This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceedings by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

\*      \*      \*      \*      \*      \*

"Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.'"

Several years later, the Supreme Court in *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), upheld a manslaughter conviction arising from an automobile accident involving Breithaupt who had been driving while intoxicated. At trial, the result of a test on a blood sample extracted, at a policeman's request, while Breithaupt was unconscious, was admitted into evidence. In sustaining the conviction the Court compared the facts in *Breithaupt* to those in *Rochin* and noted:

"We set aside the conviction because such conduct 'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency. We therefore found that the conduct was offensive to due process. But we see nothing comparable here to the facts in *Rochin*." *Id.* 352 U.S. at 435, 77 S.Ct. at 410.

The Court concluded that a procedure that "has become routine in our everyday life" and is performed by a "skilled technician is not such 'conduct that shocks the conscience', . . ., nor such a method of obtaining evidence that it offends a 'sense of justice,' . . . ." *Id.* 352 U.S. at 437, 77 S.Ct. at 411.

In 1961, the Supreme Court in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) applied the exclusionary rule to the States through the Fourteenth Amendment. Accordingly, the standards guaranteed by the Fourth Amendment came to be applied in search and seizure cases. Therefore, in 1966, the Court determined the propriety of the seizure in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) in the light of both the Fourth and Fourteenth Amendments.

In *Schmerber*, a blood sample was taken following an arrest for driving while intoxicated. The Court first noted that "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Id.* 384 U.S. at 767, 86 S.Ct. at 1834. It noted that "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Id.* 384 U.S. at 768, 86 S.Ct. at 1834. The Court discussed the constitutional requirements attending the question presented and concluded:

"[T]hat the present record shows no violation of petitioner's right under the Fourth and Fourteenth Amendments to be free of unreasonable searches and seizures. It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." *Id.* 384 U.S. at 772, 86 S.Ct. at 1836.

In my opinion, we are told by *Schmerber* that we are to decide questions of the constitutional propriety of intrusions into a person's body on a case to case basis. More importantly, we are told that "[t]he integrity of an individual's person is a cherished value of our society . . . ," and *unless* we can declare an intrusion into an individual's body a "minor intrusion," we must hold such intrusion impermissible.

The principal opinion relies heavily on the case of *United States v. Crowder*, 543 F.2d 312 (D.C.Cir. 1976). In so doing, the principal opinion fails to address the due process and Fourth Amendment problems with which the Court was concerned in *Rochin, Breithaupt* and *Schmerber*. An excellent case note on *Crowder* appears at 55 Texas Law Review 147 (1976). Particularly appropriate here is the following which appears at pages 153 and 154:

"The *Crowder* majority focused upon the reasonableness of the authorization

procedure rather than the reasonableness of the intrusion itself. Consequently, the court passed over a significant line of fourth amendment cases as well as a number of state bullet removal and bodily intrusion cases to reach its decision. At the outset, the *Crowder* majority defined a reasonable operation as one with a very low risk of permanent injury. Then under the rubric of procedure the court further circumscribed this definition. Only when probable cause exists for a court to believe that an operation would produce relevant and necessary evidence may the operation proceed. As if to concede the high risk of error inherent in these mixed medical and legal judgments, the court emphasized the availability of an adversary hearing and full appellate review before the operation may even begin. This analytical framework, however, neglects several elements implicit in other branches of fourth amendment case law. First, in the *Crowder* analysis bodily sanctity counts for nothing; the court deems *Schmerber* to have abdicated it. If the court believed that *Schmerber* established the fourth amendment reasonableness of evidentiary medial procedures, it should have labored harder to close the analytical gaps between the nature of the blood test that *Schmerber* authorized and the *Crowder* surgery. Only consideration of the bodily sanctity element can ensure accurate fourth amendment analysis. An analysis that comprehends only the risk of permanent injury as the index of reasonableness weighs heavily in favor of authorizing most medically advisable operations.

"In evaluating *Crowder* and similar cases, courts have several options open to them: they may proceed on a case-by-case basis as *Crowder* purports to do; they may identify a class of surgery that is unreasonable per se and consider other cases as they arise; or they may hew close to the *Schmerber* holding and find all but routine body intrusions such as blood tests unreasonable per se. In deciding whether surgical intrusions should be ruled illegal per se, courts must first determine if there exists a workable test that can be applied on a case-by-case basis. A balancing test rather than the procedural test of *Crowder* most accurately reflects the interests at stake in each instance of proposed surgery.

Five elements deserve consideration in making this decision. Implicitly, these elements strike a balance between the state's interest in obtaining evidence through surgery and the individual's interest in the inviolability of his body. Analysis of these points may suggest a risk of judicial error great enough to support complete disallowance of surgery for evidence under any circumstances. On the other hand, these five concerns may constitute a judicially manageable test for case-by-case surgical authorizations. The first four—the risk of harm to defendant, the purpose of the intrusion, a clear indication that the intrusion would produce the desired evidence, and the magnitude of the public interest—deserve equal weight; the final element—sanctity of the human body—should predominate unless overwhelmed by the first four. These first three elements are consistent with the factors considered in the *Crowder* approach and most of the state bullet removal cases, although the proposed evidentiary standard—clear indication—goes beyond the probable cause requirement of *Crowder*. The fourth element—public interest—is suggested by an examination of the *Schmerber* and *Breithaupt* analyses. The preeminence of bodily integrity rests upon the notion that the integrity of an individual's person is an especially cherished value of our society. Only when, as in *Schmerber,* an invasion of human dignity is outweighed by the importance of other factors, should courts authorize an intrusion."

I respectfully submit that the principal opinion, as did *Crowder,* has "focused upon the reasonableness of the authorization procedure rather than the reasonableness of the intrusion itself." I would urge the adoption of a balancing test on the order of the one suggested in the case note in the

Texas Law Review. In my opinion, if such guidelines were adopted, we would be compelled to find the surgical procedure involved here an unreasonable intrusion into defendant's body.